**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE RENCO GROUP, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 18-1311 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | Magistrate Judge Patricia L. Dodge |
| STEELWORKERS PENSION TRUST, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

## I. MEMORANDUM

Plaintiffs, The Renco Group, Inc., and its subsidiaries, Ilshar Capital, LLC, Blue Turtles,

Inc., Unarco Material Handling Inc., Inteva Products, LLC, the Doe Run Resources Corp. and

US Magnesium LLC (collectively referred to as "Renco") have brought this action under the

Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001-1500 (ERISA), as amended by

the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) against Defendant,

Steelworkers Pension Trust ("SPT") by its chairman, Daniel A. Bosh.

Renco seeks to vacate a final arbitration award issued in favor of SPT on September 25,

2018 by Arbitrator Ira F. Jaffe ("the Arbitrator"). The Arbitrator held that Renco was

responsible for the withdrawal liability claimed by SPT against Renco's former wholly-owned

subsidiary, RG Steel, LLC ("RG Steel") − when it filed voluntary petitions under Chapter 11

of the Bankruptcy Code and permanently ceased operations on May 31, 2012 − because Renco

remained a member of RG Steel's controlled group. Although Renco sold 24.5% of RG Steel to

Cerberus Capital Management, L.P. ("Cerberus") on January 17, 2012 ("the Cerberus

Transaction"), thus removing Renco from RG Steel's controlled group, the Arbitrator concluded

that this transaction had a principal purpose of evading or avoiding Renco's withdrawal liability, and, thus, should be disregarded pursuant to § 4212(c) of ERISA, 29 U.S.C. § 1392(c).

Before the Court are Renco's Motion for Partial Summary Judgment (ECF No. 24), seeking to vacate the Arbitrator's Final Award; and SPT's Motion for Summary Judgment (ECF No. 34), seeking confirmation. The Motions have been fully briefed, and oral argument was held on July 31, 2019. For the reasons that follow, Renco's Motion will be denied and SPT's Motion granted.

## BACKGROUND

### A. Relevant Procedural History

On February 22, 2016, SPT commenced an action against Renco in this Court at Civil Action No. 16-190, alleging that Renco was responsible for $86,181,976.00 in withdrawal liability incurred by RG Steel to SPT. SPT alleged that Renco had exited RG Steel's controlled group through a transaction having a principal purpose of evading or avoiding withdrawal liability, and therefore, the transaction must be disregarded pursuant to 29 U.S.C. § 1392(c). Renco filed a motion to dismiss on the ground, *inter alia*, that SPT's substantive claims had to be arbitrated in the first instance. On August 22, 2016, a Report and Recommendation ("R&R") was issued, recommending that the motion be granted and that the parties be directed to arbitrate SPT's claims. On September 21, 2016, the Court adopted the R&R (Civ. A. No. 16-190, ECF No. 55) and its ruling was affirmed by the Court of Appeals for the Third Circuit on May 31, 2017. (Civ. A. No. 16-190, ECF No. 73.)

The Court appointed the Arbitrator in June of 2017. (Civ. A. No. 16-190, ECF No. 72). As part of the arbitration, the parties filed extensive pre-hearing and post-hearing briefs, and seven days of hearings were held between September 26, 2017 and March 22, 2018.

The record also incorporated facts from a lawsuit commenced by the Pension Benefit Guaranty Fund ("PBGC") in January of 2013 in the United States District Court for the Southern District of New York against various members of the Renco Group (*PBGC v. The Renco Group*, No. 13-cv-621) ("the PBGC Litigation").[1]

Before the arbitration concluded, SPT filed an action in this Court against Renco, on January 31, 2018, at Civil Action No. 18-142. In that case, SPT sought the imposition of interim withdrawal liability against Renco. The parties eventually stipulated to the amount of interim withdrawal liability and other damages, except for the applicable interest rate, said issue being the subject of a pending motion for summary judgment in 18-142.

On July 18, 2018, the Arbitrator issued a 76-page Interim Ruling and Award on the merits of SPT's withdrawal liability claim against Renco. (Compl. Ex. A, Attach. A.) The Arbitrator ruled in SPT's favor, finding that, under 29 U.S.C. § 1392(c), a principal purpose of the Cerberus Transaction was to evade or avoid withdrawal liability, such that Renco effectively was a member of the RG Steel controlled group on the date RG Steel ceased operations. The Arbitrator concluded that Renco was liable to SPT for the full amount of withdrawal-liability attributable to RG Steel.

A Final Award was issued by the Arbitrator on September 25, 2018. The Final Award incorporated all prior Interim Rulings, Opinions and Awards. (Compl. Ex. A.) The Arbitrator found that Renco was liable for RG Steel's withdrawal liability in the amount of $78,664,224.00, plus interest.

---

[1] The PBGC Litigation will be discussed further herein.

Renco then commenced this action, on October 1, 2018, seeking to vacate the Arbitrator's Final Award. Jurisdiction is based on 29 U.S.C. §§ 1401(b)(2), 1451(a) and 1451(c). (Compl. ¶ 7). The Complaint alleges in Count I that the interim payment rulings should be vacated. In Count II, Renco contends that the Arbitrator's September 25, 2018 Final Award should be vacated.

Shortly thereafter, on October 24, 2018, SPT filed an action to confirm the Arbitrator's Final Award. SPT's action was docketed at Civil Action No. 18-1429, and it later was consolidated with this proceeding.

On January 4, 2019, Renco paid SPT $50 million. Shortly thereafter, the parties entered into a Consent Order (Civ. A. No. 18-142, ECF No. 63) − approved by the Court on January 10, 2019 (*id.* ECF No. 64) − under which Renco agreed to pay the principal balance of $28,664,224.00 by May 10, 2019.[2]

On December 28, 2018, Renco filed a Motion for Partial Summary Judgment (ECF No. 24), seeking to vacate the Arbitrator's Final Award. On March 15, 2019, SPT filed a Motion for Summary Judgment (ECF No. 34), seeking confirmation of the Award. On July 31, 2019, Magistrate Judge Dodge held oral argument on both Motions, as well as SPT's motion for summary judgment in Case No. 18-142, regarding the interest-issue.[3]

**B. The Arbitrator's Decision**

The Arbitrator began his Opinion and Award with the following observation:

---

[2] The record does not reflect whether this payment was made. Neither side has raised the issue, however, so the Court has no reason to believe it went unpaid.

[3] The Court has reviewed the transcript of the oral argument, as well as the Power Point materials that were displayed during the oral argument.

> No point would be served by attempting to summarize the entirety of the record evidence in this case (which included over 13,000 pages of exhibits marked as Fund or Employer exhibits, several hundred thousand pages of exhibits and depositions and transcripts from the PBGC litigation, and additional depositions and exhibits and expert reports and items produced in discovery in this arbitration). Nor will the contentions of the Parties be summarized other than as is relevant to an explanation of the ruling in this case; the post-hearing briefs and reply briefs alone total almost 400 pages. Rather, it should simply be noted that the entire record has been carefully reviewed by the Arbitrator prior to issuing the decision in this matter and that record evidence will be referenced as appropriate and necessary to explain the ruling in this case.

(*Id.* at 4-5.)[4] As observed by SPT, the Arbitrator was required to state "the basis for the award, including such findings of fact and conclusions of law (which need not be explicitly designated as such) as are necessary to resolve the dispute." 29 C.F.R. § 4221.8(a)(1). The parties do not contend that the Arbitrator failed to properly state his bas(es) for the award.

The instant ruling will not be improved by a detailed-recitation of the background facts and events that occurred prior to the negotiations culminating in the Cerberus Transaction. Thus, the Court will restrict its present discussion to a brief summary of the history leading to the relevant events.[5]

In March 2011, RG Steel, LLC, which was wholly owned by RG Steel Holdings, LLC, and which in turn was wholly owned by Renco, purchased a number of mills and related properties from Severstal US Holdings, LLC, Severstal US Holdings II, Inc., and Severstal Sparrows Point, LLC; including three steel mills in Wheeling, Warren, and Sparrows Point. The Wheeling and Warren operations sponsored single employer, defined-benefit pension plans

---

[4] Similarly, in connection with the pending Motions, the parties also have filed hundreds of pages of briefing and thousands of pages of exhibits, including materials from the arbitration and the PBCG Litigation.

[5] The undisputed facts cited in this section come directly from pages 2 and 3 of the Interim Opinion and Award.

covered by Title IV of ERISA. RG Steel was a party to collective bargaining agreements that provided for contributions to be made to the Fund on behalf of bargaining unit employees at Wheeling and Sparrows Point.

As a result of this acquisition, Severstal exited the controlled group and Renco became a member of the controlled group that included RG Steel.

At the time of Renco's acquisition, RG Steel was the fourth largest steel company, capacity-wise, in the United States. A group of eleven lenders ("the Bank Group") provided a revolving line of credit for RG Steel's use, as needed, in the operations of the business. Ira Rennert, owner and founder of Renco, had prior experience owning and operating steel mills, having purchased WCI (Wheeling) in or around 1988 and operating it until its bankruptcy in 2003. He had excellent relations with the United Steelworkers of America ("USW" or "Union"), and RG Steel negotiated successor collective bargaining agreements with the USW covering the RG Steel facilities.

### C.  Relevant Factual Findings and Conclusions of Arbitrator[6]

#### 1.  Renco Seeks Lenders for RG Steel

As the Arbitrator noted, there is no dispute that Renco was a large and successful entity. It was founded in 1975 by Ira Rennert as a private, family-owned investment holding company that, by 2012, owned and operated eight companies, with consolidated revenues in excess of $5 billion, and a robust balance sheet with significant equity and liquidity. Renco did not have outside partners or investors, and preferred to own and control all of its businesses. (Op. & Award at 31-32.)

---

[6]  Unless otherwise noted, all citations are to the Interim Opinion & Award ("Op. & Award").

Although Renco initially believed that it could profitably operate RG Steel, the reality turned out to be different: "By the end of 2011 and early 2012, RG Steel was cash-starved, was not paying its creditors, and was on the verge of a forced bankruptcy. By late 2011, RG Steel was losing approximately $30 million a month ($1 million a day)." (Op. & Award at 24.) In late October 2011, at the request of the Bank Group holding RG Steel's revolving line of credit,[7] Renco hired a financial advisor, who sent out a "teaser" to prospective potential lenders seeking interest in providing a $200 million loan for RG Steel. Given Renco's preference to solely own its businesses, no equity was offered as part of the teaser. None of the recipients, including Cerberus, expressed interest. (*Id.* at 26, 27.)

Another of the potential lenders to whom the initial communication was sent suggested that Renco would need to offer equity in order to obtain the requested funds. Thus, while its initial efforts to obtain loans for RG Steel did not include the prospect of equity, Renco changed its stance when its initial efforts were unsuccessful. Elliot Management Corporation ("Elliott") then offered to provide a $200 million loan to RG Steel in exchange for various securities, interest and "the issuance to Elliott of warrants entitling Elliott to purchase 75% of the common and preferred [s]hares outstanding at a price per share based on a total equity valuation of $25 million, with the warrants expiring 5 years after the closing date." (*Id.* at 28-29.)

On January 3, 2012, Elliott revised its proposal to provide a $125 million loan for 39% of the equity, with a first lien on non-current assets, and including "the issuance to Elliott of 'penny warrants' (*i.e.*, warrants at a price per share of $0.01) in the amount of 39% of the common and preferred shares of RG Steel." (*Id.* at 30.) However, on January 11, 2012, Elliott was informed

---

[7] The Bank Group included Cerberus (*Id.* at 3, 48). The Arbitrator noted that, during November and December 2011, Renco tried to obtain additional liquidity from the Bank Group under the existing revolving credit arrangement, but these efforts proved unsuccessful. (*Id.* at 29.)

by Renco that it "should not spend significant time or money [pursuing] this opportunity." (*Id.* at 31.)

## 2. Negotiations Leading Up to the Cerberus Transaction

After receiving Elliott's term sheet, Renco approached Cerberus with a mixed-loan equity proposal. (*Id.* at 32.) Ira Rennert asked his son, Ari, to contact Cerberus and offer it "the opportunity to complete a transaction in which Cerberus loaned RG Steel $125 million in exchange for receiving 49% of the equity of RG Steel." (*Id.* at 29.) On January 10, 2012, Renco and Cerberus reached a "handshake" agreement in principle – contemplating a $125 million loan with a 49% "equity kicker" − although many details remained outstanding. (*Id.* at 49.)

In examining the evidence regarding the negotiations, the Arbitrator found:

> Early in [the] discussions, it became clear that Renco and Cerberus had different expectations as regards the type of equity that was to be part of the transaction. Cerberus wanted penny warrants – *i.e.*, warrants/options to purchase membership units that could be exercised for one penny each – and did not wish to receive direct equity (*i.e.*, membership units in RG Steel Holdings LLC). Renco wanted Cerberus to take direct equity on day one.

(*Id.* at 50.) Michael Ryan, a partner with Cadwalader, Wickersham & Taft LLP ("Cadwalader"), who initially was outside counsel for Renco and later became Renco's General Counsel, repeatedly sought to persuade Cerberus and/or its counsel, Schulte, Ross and Zabel ("SRZ"), to have the equity component consist of membership units[8] rather than warrants, at least with respect to the "permanent" warrants (which represented 24.5% of the equity of RG Steel

---

[8] Renco asserts: "A membership unit is a direct ownership interest in a limited liability company − akin to a 'share' of a corporation − and a warrant is a security that gives the warrant holder the option to purchase direct ownership at a set price." (ECF No. 26 at 13 n.3.)

Holdings LLC). Mr. Ryan testified that his request was to "ensure that the PBGC could not assert 'some crazy argument' that the warrants were insufficient to remove Renco from the controlled group that included RG Steel." (*Id.* at 50-51.)

On January 10, 2012, Mr. Ryan advised Larry Goldberg, an attorney with SRZ who represented Cerberus, that Renco wanted Cerberus to be an owner of 24.5% of the membership units of RG Steel Holdings LLC when the transaction closed. Mr. Ryan explained that Cerberus would get its full $125 million in "sub debt" and that it would be a 24.5% owner immediately with warrants for another 24.5%. (*Id.* at 51-52.)

Although Mr. Goldberg did not object, Daniel Wolf, the CEO of Cerberus, had a different reaction. In a January 12, 2012 e-mail, in which he identified a number of issues with the proposed transaction that were problematic to Cerberus, he stated in pertinent part: "We have always discussed warrants. We are a lender and we should [not] be forced to hold direct equity. That was always the discussion." (*Id.* at 52.)

On January 13, 2012, Cerberus concluded that the negotiations were at a standstill, and directed SRZ attorneys to stop work on the proposed transactions. However, Renco instructed its counsel to continue in the hope that the transaction might nonetheless go forward. At Renco's request, a dinner meeting took place on the evening of January 14, 2012, at Ira Rennert's residence, attended by many of the principals for Renco and Cerberus. The primary obstacles to reaching a deal were disputes over the capital call provisions and the credit support provisions. However:

> At some point towards the end of the meeting, Mr. Ryan raised to [Cerberus co-founder and CEO Stephen] Feinberg the question of whether Cerberus would agree to take direct equity instead of the first tranche of warrants (*i.e.*, the "Permanent" warrants). Mr. Ryan did not indicate the reason for that request nor did Mr. Feinberg ask Mr. Ryan why that item was important to Renco. Mr. Feinberg replied that he was agreeable to direct equity in lieu of warrants,

> if the SRZ attorneys approved and indicated that taking direct equity would not
> result in additional obligations for Cerberus.

(*Id.* at 53-54.)

The following morning, Mr. Ryan followed up regarding this issue with Stuart Freedman,

an SRZ attorney who was working on the equity components of the Cerberus Transaction,

who in turn called Ronald Richman, an SRZ attorney specializing in ERISA matters, and asked

if the receipt of membership units by Cerberus would create any risk under ERISA for Cerberus.

"Upon being told that the answer to that question was no, Mr. Freedman gave SRZ's approval to

the change from warrants to membership units." (*Id.* at 54.) On January 17, 2012, the Cerberus

Transaction was finalized. (*Id.* at 55.)

On May 31, 2012, RG Steel filed for bankruptcy and permanently ceased operations.

(*Id.* at 4.) As a result, SPT assessed both RG Steel and Renco with withdrawal liability.

Renco disclaimed withdrawal liability on the ground that, following the Cerberus Transaction,

it was no longer part of RG Steel's controlled group.

### 3. Renco's Interactions with the PBGC During the Same Time Frame

As explained in the Interim Opinion and Award, the provisions of 29 U.S.C. § 1343

require plan administrators and sponsors to provide at least 30 days' notice to the PBGC[9]

of various reportable events, including a transaction that will result in one or more persons

---

[9] The PBGC is "a wholly owned United States Government corporation, *see* 29 U.S.C. § 1302, modeled after the Federal Deposit Insurance Corporation," responsible for "administer[ing] and enforce[ing] Title IV of ERISA." *PBGC v. LTV Corp.*, 496 U.S. 633, 636-37 (1990). The PBGC "holds employers directly liable for underfunded − but promised − benefits, interest, and penalties, whether the liable employer is part of a single-employer pension plan or a multiple-employer pension plan." *PBGC v. Findlay Indus., Inc.*, 902 F.3d 597, 601 (6th Cir. 2018), *cert. dismissed sub nom. Sept. Ends Co. v. Pension Ben. Guar. Corp.*, 2019 WL 1455808 (U.S. Aug. 2, 2019).

ceasing to be members of the controlled group of a Title IV covered pension plan.

"On December 16, 2011, Renco filed an Advance Notice of Reportable Events (Form 10) with the PBGC notifying the PBGC that a reportable event may be occurring – *i.e.*, that Renco might enter into a transaction that could result in its exiting the RG Steel controlled group." (*Id.* at 38.)  As the Arbitrator acknowledged, this form was filed in connection with several of RG Steel's single employer defined benefit pension plans, not the SPT, which is a multiemployer plan.  The Arbitrator found, however, that "some of Renco's behavior and its motivations relative to the single employer plans and the Cerberus Transaction [nevertheless are] relevant evidence with respect to the issues in this case."  (*Id.* at 39-40.)

On January 6, 2012, Charles Cann, a financial analyst who was Renco's primary contact at the PBGC, advised Ari Rennert that the PBGC was "deeply concerned" about a proposed transaction by which Renco intended to transfer some of its equity interest in RG Steel out of its controlled group.  Mr. Cann communicated that the PBGC had "significant doubts" about RG Steel's ability to support the plans in the future if Renco was removed from RG Steel's controlled group.  (*Id.* at 40.)  If Renco did not offer a guarantee to protect the plans, Mr. Cann advised, the PBGC would move to terminate the plans to protect its interests.  (*Id.*)

Several days later, on January 9, 2012, when Mr. Cann inquired as to the status of the negotiations, Ari Rennert responded that "nothing was imminent."  As the Arbitrator noted: "No mention was made during the call or in any written communications with the PBGC prior to the closing of the Cerberus Transaction of the fact that Renco was in negotiations with Cerberus with respect to a possible loan and equity deal."  (*Id.* at 41.)  Moreover, "[d]espite the commitment of Ari Rennert to keep the PBGC apprised of developments, there [is] no evidence that Renco advised the PBGC of the progress in the negotiations with Cerberus prior to advising

that the Cerberus Transaction had closed." (*Id.* at 42-43.)

On January 10, 2012, Mr. Cann sent Renco a document that outlined "broad terms for a settlement agreement structured around a guarantee for the RG Steel pension plans." Ari Rennert responded that Renco would review it. When Mr. Cann had not heard back from Renco by January 12, 2012, he wrote to Ari Rennert asking to talk that afternoon. (*Id.* at 43-44.) Mr. Cann testified that he and others were preparing Notices of Termination for the Wheeling and Warren single employer plans, and by Friday, January 13, 2012, the PBGC was ready to implement them. But that day, Mr. Cann spoke to Ira and Ari Rennert and was left with the impression that Renco was amenable to signing a "standstill agreement." For this reason, and because the Rennerts told him that no transaction was imminent and "equity was off the table," Mr. Cann felt less urgency about proceeding with the plan-terminations. Ari Rennert indicated that he would send the proposed standstill agreement to Renco's counsel and get back to him. (*Id.* at 44.)

The Martin Luther King holiday fell on Monday, January 16, 2012. On the morning of January 17, 2012 (the first business day after the 30-day notice period), Mr. Cann contacted Ari Rennert to schedule a telephone call. Ari Rennert responded that he had a meeting out of the office in the morning and would be available after 2 p.m. An afternoon call was scheduled, at which point:

> Ari Rennert advised Mr. Cann . . . that Renco had closed the Cerberus Transaction earlier that day. He described the infusion of capital, including for the first time that the lender would be Cerberus and Abeleco, a Cerberus-related company. When asked . . . whether Renco would stand behind the pension plans, Mr. Rennert replied that Renco now owned only 74.5% of RG Steel and was out of the controlled group and consequently did not have to do so.

(*Id.* at 45.)

In a January 17, 2012 communication to Ari Rennert, Mr. Cann accused Renco of "'having made representations [that] were false' and noting that the PBGC intended to pursue all available legal rights."  Ari Rennert responded several days later, denying that any false representations had been made, and asserting that as of the January 13th telephone conversation, no transaction was "imminent" because several contentious points had caused Cerberus to go "pencils down."  Mr. Rennert also advised Mr. Cann that Renco had worked through the weekend, made significant concessions, revived the parties' discussions and completed a deal with Cerberus that saved RG Steel and preserved thousands of jobs.  (*Id.* at 46.)  According to Mr. Rennert, while Renco previously had indicated a willingness to consider a standstill agreement with the PBGC, Renco was concerned with the PBGC's "overreaching demands and apparent inflexibility."  Renco made no offer to provide the PBGC with any guarantees relative to the single employer plans should RG Steel not have a secure future.  (*Id.*)

On November 13, 2012, the PBGC and the plan administrators terminated the Warren and Wheeling single employer plans, effective August 31, 2012.

The PBGC subsequently commenced an action in the United States District Court for the Southern District of New York in January 2013 against various members of the Renco Group.  The Complaint alleged, in essence, that by entering into the Cerberus Transaction with a principal purpose to evade or avoid liability, Renco violated the provisions of Section 4069 of ERISA, 29 U.S.C. § 1369, and had engaged in fraudulent conduct.  (*Id.* at 47.)  A bench trial was conducted in December of 2015, but prior to the issuance of a decision, Renco and the PBGC entered into a settlement agreement effective March 2, 2016.  The agreement required Renco to restore the single employer plans, to pay participants in accordance with the terms of the plans, to fund them at certain minimal levels and to provide ongoing financial and other reporting to the

PBGC.  Renco did not admit any wrongdoing as part of the settlement.  (*Id.* at 47-48.)

## ANALYSIS

### A.  Standard of Review

In the present context, "the district court presumes that the arbitrator's factual findings are correct unless they are rebutted by a clear preponderance of the evidence.  The arbitrator's legal conclusions are reviewed *de novo*."  *Crown Cork & Seal Co. v. Central States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citing 29 U.S.C. § 1401(c)).  A court should overturn a finding of fact only if it is "left with the definite and firm conviction that a mistake has been committed."  *Concrete Pipe & Prod. of Calif., Inc. v. Construction Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 622 (1993) (citation omitted).  "Our judicial system affords deference to the finder of fact who hears live testimony of witnesses because of the opportunity to judge the credibility of those witnesses."  *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995).  This same principle applies when the fact finder's opinion contains implicit credibility determinations.  *Id.*[10]  In reviewing mixed question of fact and law, "we apply a clearly erroneous standard to findings of fact and conduct plenary review of conclusions of law, applying the appropriate standard to each component."  *Crown Cork* at 861 (citation omitted).

### B.  Withdrawal Liability Under ERISA

"The MPPAA was enacted out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual

---

[10]  Although both sides have represented that they are not challenging the Arbitrator's findings of fact (ECF No. 25 at 1; ECF No. 44 at 20, 35; ECF No. 49 at 8; ECF No. 51 at 12 & n.4; Hr'g Tr. at 3, 66.), they nevertheless each have submitted lengthy recitations of their own versions of events.

employers terminate their participation or withdraw." *SUPERVALU, Inc. v. Board of Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 336 (3d Cir. 2007). Pursuant to ERISA, when a contributing employer to a multiemployer pension plan withdraws from the plan, the plan may seek to recover from the employer the amount of any unfunded vested benefits attributable to the employees of the withdrawn employer. 29 U.S.C. § 1381(a). Withdrawal liability extends to any trade or business under "common control" with the withdrawing employer. 29 U.S.C. § 1301(b). Congress extended liability to all entities in common control with the withdrawing employer, because the legislation prior to the MPPAA "did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984).

Thus, when withdrawal liability is imposed on an employer, all other commonly controlled trades or businesses – that is, those entities within the withdrawing employer's "controlled group" – are liable as well. *Doherty v. Teamsters Pension Trust Fund*, 16 F.3d 1386, 1388 (3d Cir. 1994). MPPAA extends membership within a "controlled group" to entities owning at least 80% of the withdrawing employer. 29 U.S.C. § 1301(b) (incorporating 26 C.F.R. § 1.414(c)-2(b)).

Critically for purposes of this case, ERISA provides that, "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c).

Thus, the fundamental issue in this case is whether, as the Arbitrator concluded, a principal purpose of the Cerberus Transaction was to evade or avoid withdrawal liability. If so, the transaction must be disregarded, and Renco is responsible.

### C. **Basis for Arbitrator's Award**

SPT argued during the arbitration proceedings that, from the beginning, the intent behind the Cerberus Transaction was to evade or avoid withdrawal liability. The Arbitrator concluded otherwise. As set forth in his Opinion, "the preponderance of the record evidence effectively rebuts the assertion of the Fund that Renco believed at the time of the Cerberus Transaction that RG Steel was going to fail. If Renco had given up on RG Steel and accepted its failure, then it would never have entered into the Cerberus Transaction." (Op. & Award at 65.) The Arbitrator further found that: 1) the Cerberus Transaction required Renco to invest far more money in RG Steel than what it would save in withdrawal liability if RG Steel failed; 2) Renco's preference was to obtain money for RG Steel without giving up equity, but the market demanded an equity component; 3) there was no indication that Renco or RG Steel inflated equity component to exceed the 20% needed for Renco to leave the RG Steel controlled group; and 4) Renco's preference for Cerberus as a lender/partner was understandable and was not shown to be motivated by considerations of evading or avoiding withdrawal liability. (*Id.* at 65-67.)

Nevertheless, the Arbitrator found wholly unpersuasive Renco's claim that it "lacked knowledge of the magnitude of likely withdrawal liability for RG Steel in the event that the business failed and a complete withdrawal occurred." (*Id.* at 68.) Citing record-evidence that Renco was well aware of RG Steel's withdrawal liability, the Arbitrator found that the Rennerts' claims that they were ignorant of the magnitude of RG Steel's potential liability were "simply unpersuasive and contrary to the weight of the . . . evidence." (*Id.* at 68-69.)

In reaching his conclusions, the Arbitrator also relied upon Renco's interactions with the PBGC:

Renco determined that it wished to exit the RG Steel controlled group and provided notice to the PBGC of that potentiality. When the PBGC advised Renco that it would be seeking some form of guarantee or else would consider initiating plan terminations, triggering claims for termination liabilities of $70 million absent some arrangement whereby Renco continued to maintain and fund those plans (and commit to do so for the future regardless of its controlled group status), Renco undertook steps to close the Cerberus Transaction quickly and in secret from the PBGC. Renco also had informed the PBGC that it would advise them of any relevant developments and then failed to do so. Renco also advised the PBGC that it would consider [a] standstill agreement when it apparently had no intention of agreeing to such a restriction after it had completed the Cerberus Transaction that resulted in its exit from the RG Steel controlled group.

(*Id.* at 69.)

Renco claimed that it was not concerned about its liability for the single employer plans (which it estimated at $20 to $25 million); rather, it was concerned only that the PBGC might terminate the single employer plans and prevent the completion of the Cerberus Transaction. If that had been Renco's only motivation, however:

then one would have expected Renco to have agreed after the close of the Cerberus Transaction to some form of guarantee for the single employer plans. Renco did not. It, in fact, resisted responsibility for the single employer plans until after the PBGC had initiated litigation and gone to trial. Only after trial did it settle and agree to reconstitute the plans and guarantee their funding.

(*Id.* at 70.)

The Arbitrator then connected Renco's interactions with the PBGC regarding the single employer plans with those regarding the multi-employer plan as follows:

If Renco were so concerned over what it viewed as $20 million to $25 million in potential exposure for the single employer plans, it is inconceivable that it blithely ignored the question of potential liability for withdrawal liability to the Fund[,] which was reasonably estimated to be in the order of magnitude of $75 million or more.

*Id.*

The Arbitrator's central conclusions were as follows:

17

Although I found that the weight of the record evidence establish[s] that evasion or avoidance of withdrawal liability was not shown to have been a factor in the decision to seek to investment from the outside or even in the decision to pursue an arrangement after the market made clear that equity would need to be involved, the final terms of the Cerberus Transaction were different in ways that were meaningful in terms of both the effect of the transaction and Renco's likely motivations. As noted, the final transaction did not have any of the proceeds of the investments being returned to Renco. To the contrary, as a result of the credit support provisions of the Cerberus Transaction, the new liquidity was coming ultimately from Renco and not from RG Steel's assets. The market's requirement for equity was one that demanded penny warrants, not direct equity. It was only at the repeated urging of Renco that the provisions for the penny warrants that were under discussion were converted in the final transaction to a mix of direct equity and warrants. The final Cerberus Transaction thus transferred enough membership units (24.5%) to reduce Renco's ownership interest pursuant to the applicable IRS Regulations below the 80% threshold needed to have Renco remain in the RG Steel controlled group.

Having found that one of the principal purposes of the Cerberus Transaction was a legitimate business reason of introducing much needed capital to a concern that was distressed, but where recovery was believed to be conceivable, and for reasons unrelated to the evasion or avoidance of withdrawal liability, the question is presented as to whether the inclusion in the structure of the Cerberus Transaction of the transfer of direct equity established that a second principal purpose of that transaction the evasion or avoidance of withdrawal liability. The record clearly establishes that Cerberus preferred warrants, but ultimately did not object to Renco's repeated requests to change the "Permanent" Warrant to direct equity. The record also establish[s] clearly that, while an equity component may have been dictated by market conditions, the transfer of direct equity was the result of Renco's request and further that the only reason that Renco proposed direct equity instead of the Permanent Warrant was to ensure that there could be no doubt that it successfully left the RG Steel controlled group. The effect of the change to direct equity was to ensure that if RG Steel did not recover, as hoped for, and ceased operations, thereby triggering withdrawal liability to the Fund in the amount of $75 million or so, Renco would not be responsible for that liability.

(*Id.* at 70-71.)

The Arbitrator noted that, if the restructuring from penny warrants to membership units had been unintended or ancillary to the transaction as a whole, then Renco would not be held liable for RG Steel's withdrawal liability. But he concluded that this was not the case:

[T]he preponderance of the record evidence strongly suggests that it was one of the major or principal purposes of the transaction. The amount of money that [was] avoided is large, even when compared to the amount of the transaction. The record reveal[s] that Renco was concerned about avoiding liability for the single employer plans as a result of the transaction and that it was on notice (at least constructive notice and probably actual notice) of the likely magnitude of the potential withdrawal liability to the Fund. The transaction was a highly risky one and while Renco and others hoped and expected that RG Steel would recover and prosper, that outcome remained highly uncertain. The change to direct equity was made at Renco's behest and, while not stated to be a condition precedent to the Cerberus Transaction, the change was repeatedly requested. Further, Mr. Ryan admitted that the sole purpose for the request was a desire to have Renco cleanly exit the RG Steel controlled group – action that, as noted, would result in Renco potentially avoiding a very large projected amount of withdrawal liability to the Fund as well as a significant amount of liability with respect to RG Steel's single employer pension plans.

(*Id.* at 72-73.)

Renco argued that it could not be held liable unless evasion or avoidance of withdrawal liability was a "but for" cause for the Cerberus Transaction. The Arbitrator rejected this argument as well:

The transaction in this case had multiple major motivations. The transaction was structured as one involving a transfer of direct equity solely to facilitate the evasion or avoidance of withdrawal liability in the event of a complete withdrawal from the Fund by RG Steel. The evasion or avoidance of withdrawal liability was a motivating factor in terms of the structuring of the Cerberus Transaction's provisions regarding direct equity. That is sufficient to support the application of Section 4212(c) by the Fund. Even if a "but for" framework were appropriate, however, the record evidence reveals that "but for" the goal of evading or avoiding withdrawal liability, the Cerberus Transaction would not have been structured to include a direct assignment of membership units and, instead, would have simply provided Cerberus with warrants.

(*Id.* at 73.)

Finally, the Arbitrator rejected Renco's argument that the Cerberus Transaction could be "replaced" with the proposed − but ultimately rejected − provision of "permanent warrants" for purposes of determining if Renco remained in the controlled group. First, he noted that

case law regarding § 1392(c) requires courts to "put the parties in the same situation as if the offending transaction never occurred; that is to erase the transaction. It does not, by contrast instruct or permit a court to take the affirmative step of writing in new terms to a transaction or to create a transaction that never existed." (*Id.* at 74) (quoting *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 149 (1st Cir. 2013)). He then reiterated his conclusion that the terms of the Cerberus Transaction were not involuntary or the result of Renco simply responding to the requirements of the market. Rather:

> it was Renco's request that changed the nature of the equity from penny warrants to direct equity – action that resulted in converting an unpersuasive and somewhat dubious claim that Renco would exit the RG Steel controlled group into a situation where there could be no doubt that Renco would exit the RG Steel group.

(*Id.* at 74.)

In the final analysis, the Arbitrator concluded that Renco was liable for all withdrawal liability, finding by a preponderance of the evidence that a principal purpose of the Cerberus Transaction was to evade or avoid withdrawal liability. (*Id.* at 74-75.)

### D. <u>Analysis of Arbitrator's Decision</u>

In urging that the Arbitrator's Award be vacated, Renco raises four main arguments: 1) the Arbitrator failed to assess the principal purpose of the Cerberus Transaction as a whole, and, instead, inappropriately focused on the change in structure from permanent warrants to direct equity membership units; 2) even under the Arbitrator's (purportedly) flawed legal standard, the Cerberus Transaction did not trigger Section 1392(c) because the change from warrants to membership units was not "structural"; the transaction would have gone forward in any event; and Renco had no illegitimate purpose for this change; 3) the Arbitrator committed

error because the change in equity terminology did not affect Renco's removal from RG Steel's controlled group, given that the use of permanent warrants also would have removed Renco under relevant tax law; and 4) even assuming his analyses otherwise were correct, the Arbitrator erroneously disregarded the entire Cerberus Transaction and should have merely disregarded the use of membership units and reformatted the transaction with permanent warrants.

Each of these issues will be addressed below.

### 1. Did the Arbitrator Apply the Correct Legal Standard in Assessing the Principal Purpose of the Transaction as a Whole?

Renco's first argument is that the Arbitrator failed to apply the correct legal standard in his assessment of whether a principal purpose of the Cerberus Transaction as a whole was to evade or avoid withdrawal liability.

As ERISA provides, if a principal purpose of any transaction is to evade or avoid liability, liability shall be determined without regard to such transaction. § 4212(c) of ERISA, 29 U.S.C. §1392(c). Renco argues that Section 4212(c) is inapplicable when it does not appear that the principal purpose of the transaction as a whole was to escape liability, citing *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund,* 787 F.2d 897, 902 (3d Cir. 1986). Renco also cites *SUPERVALU, Inc. v. Board of Trustees of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 336 (3d Cir. 2007), for the proposition that the Arbitrator erred in not considering the Cerberus Transaction *as a whole*, but rather, determined that a principal purpose of the *structuring* of the transaction was to evade or avoid withdrawal liability.

The parties and the Arbitrator agreed that the Court of Appeals for the Third Circuit's decision in *SUPERVALU* is significant in this case. Renco contends, however, that the Arbitrator misapplied *SUPERVALU* in reaching his ultimate legal conclusions. A review of the

facts, analyses and holding of *SUPERVALU* does not support Renco's position.

In *SUPERVALU*, a wholesale food distributor and contributing employer to a multiemployer fund decided to close a facility for business reasons. This action would have resulted in its potential liability to the Fund if SUPERVALU withdrew after June 30, 2002. Therefore, SUPERVALU proposed that its collective bargaining agreements (CBAs), which were set to expire on January 31, 2003, be replaced prior to June 30, 2002. The union and SUPERVALU signed a Termination Agreement in May 2002, which terminated the prior CBAs on June 29, 2002, and ended SUPERVALU's contributions to the Fund. The Fund later assessed withdrawal liability on the ground that the Termination Agreement had a principal purpose of evading or avoiding withdrawal liability. The matter proceeded to arbitration, and the arbitrator granted summary judgment in favor of the Fund, finding that "SUPERVALU was aware of its potential liability and persuaded the Union to enter the Termination Agreement to enable SUPERVALU to avoid the liability." 500 F.3d at 339. According to the arbitrator, this scenario fell squarely within the language of § 4212(c).

SUPERVALU commenced an action, in this Court, in which it sought to modify the arbitrator's award. The Court granted SUPERVALU's motion for summary judgment, reasoning that, because the Termination Agreement was a *bona fide* transaction made at arm's length, § 4212(c) was not applicable. The Court held that, where it is not clear that the employer intended to evade or avoid, as opposed to minimize, its withdrawal liability, the adjudicating-body should not interfere. *Id.* at 340.

The Court of Appeals for the Third Circuit reversed. The principal issue on appeal was whether SUPERVALU violated § 4212(c) of ERISA by entering into the Termination Agreement. That is, if a principal purpose of the transaction was to evade or avoid,

liability would be determined without regard to the transaction. 29 U.S.C. § 1392(c). The Court

of Appeals noted that, because the term "transaction" was not defined in the statute, it must be

construed by its ordinary meaning:

> Under a plain language statutory reading the provision applies when a
> contributing employer enters a transaction with a principal purpose of escaping its
> duty to pay withdrawal liability to the plan or fund.

*Id.* at 340-41.

The Circuit Court found that the modification of the CBA was a "transaction"

for purposes of § 4212(c). It rejected SUPERVALU's argument that *bona fide* arm's length

transactions are exempt from § 4212(c) and declined to limit the statute's application to

"sham transactions." *Id.* at 342-43. Moreover, as the Arbitrator noted in his Opinion, here,

the SUPERVALU Court, quoting from *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas*

*Pension Fund,* 22 F.3d 725, 729-730 (7th Cir. 1994), stated that the statutory criterion is not

whether the transaction was a sham, but whether the avoidance of liability "is one of the

principal purposes of the transaction." (Op. & Award at 21).

The Circuit Court held that the Termination Agreement was contrary to the purposes of

the MPPAA and concluded that, "as there was no other reason for SUPERVALU to enter the

Termination Agreement, its intention to evade or avoid withdrawal liability was a principal

purpose, if not its only purpose. Therefore, SUPERVALU acted with a principal purpose of

escaping withdrawal liability in violation of § 4212(c)." *Id.* at 341-42 (3d Cir. 2007).[11]

---

[11] In support of its position, Renco also relies on *CIC-TOC Pension Plan v. Weyerhaeuser Co.*,
911 F. Supp. 1088 (D. Or. 2012), and *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties*
*Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491 (9th Cir.1987). Both cases are
inapposite. *CIC-TOC* rejected the Third Circuit Court's definition of "transaction"; both cases
delved into the legislative history, which the Third Circuit Court specifically held was
inappropriate; and both cases held that § 4212(c) applies only to sham transactions, a position

Renco repeatedly refers in its briefing to the statement by the Court of Appeals in *SUPERVALU* that the pertinent issue was "whether SUPERVALU violated ERISA § 4212(c) by *entering* the Termination Agreement with the Union." 500 F.3d at 340 (emphasis added). (ECF No. 25 at 2, 23, 30, 31, 34; ECF No. 44 at 1, 2, 26, 27, 31.) Renco insists that, because the Arbitrator found that "evasion or avoidance of withdrawal liability was not shown to have been a factor in the decision to seek investment from the outside or even in the decision to pursue a different arrangement after the market made clear that equity would need to be involved" (Op. & Award at 70), he necessarily concluded that Renco's principal purpose for "entering" into the Cerberus Transaction was not to evade or avoid liability. Thus, according to Renco, the Arbitrator should have stopped his inquiry at this point and concluded that the Cerberus Transaction did not have a principal purpose to evade or avoid. Similarly, Renco contends that, because the Arbitrator believed the principals at Renco when they testified that they expected RG Steel to prosper, it was inconsistent for him to conclude that they also had an intent to evade or avoid withdrawal liability, a situation that would only occur if RG Steel failed.

Renco's reading of *SUPERVALU* − that "entering" into a transaction is the sole critical factor in determining a principal purpose of evasion or avoidance – is unavailing. Indeed, Renco admits, as it must, that a transaction may have more than one principal purpose, and that an analysis of liability is not limited to its "initial" purpose (ECF No. 25 at 30, 31). Thus, Renco's myopic emphasis on the word "entering" is not only at odds with its necessary-admissions, but also wholly unpersuasive.

_____

explicitly rejected in *SUPERVALU*. In addition, *CIC-TOC* concerned the unilateral action of closing a facility − which the court held was not a "transaction" at all − and the issue in that case was the timing of the transaction, not a change in the structure. These cases are in fundamental conflict with *SUPERVALU*, and also are factually distinguishable.

The Circuit Court did not hold that the critical inquiry is limited to an employer's reason for "entering" the transaction. The only issue in *SUPERVALU* was whether the decision to enter into the Termination Agreement had a principal purpose to evade or avoid. Nevertheless, as SPT argues, the court stated that "§ 4212(c) is violated when one of the main reasons for entering a transaction is to effectuate [the] goal [of evading or avoiding withdrawal liability.]" *Id.* at 341. Thus, the *SUPERVALU* decision plainly acknowledged that a transaction may have more than one principal purpose.

Other decisions, cited both by the parties and the Arbitrator, address the issue of multiple principal purposes; as well as the relevance of the transaction-structure. In *Santa Fe*, the Court of Appeals for the Seventh Circuit reversed a district court's affirmance of an arbitration decision on the premise that the company's sale of a trucking subsidiary (SFTT) did not have a principal purpose to evade or avoid withdrawal liability. The court emphasized:

> Proper analysis of the case requires distinguishing between two different desires of Santa Fe. One was to rid itself of SFTT. The other was to sell SFTT. These sound alike but are different. There is no doubt that for reasons unrelated to withdrawal liability Santa Fe wanted to [be] rid of the subsidiary. . . . But the sale of the subsidiary as a going concern, as by selling the stock of SFTT, was only one possible method of getting rid of the subsidiary. The other was to sell off its assets, either piecemeal or in a lump . . . . The issue is not whether Santa Fe had compelling reasons independent of withdrawal liability to divest itself of SFTT; that is a given. The issue is the *form* the divestiture took − a sale of stock rather than of assets. The statutory criterion is not whether the transaction is a sham, having no purpose other than to defeat the goals of the [MPPAA] by leaving the other employers in the multiemployer pension plan holding the bag. It is whether the avoidance of withdrawal liability by the seller (not necessarily by the purchaser as well) is one of the principal purposes of the transaction.

*Id.*, 22 F.3d at 728-730.

Renco attempts to read *Santa Fe* as holding that a purpose is not "principal" if the transaction would have gone forward even if withdrawal liability concerns did not exist.

(ECF No. 25 at 30; ECF No. 51 at 13). But the court's actual statement was merely that, if the stock-sale (as opposed to an asset sell-off) had not taken place, then withdrawal liability "obviously" would not have been a principal purpose. The Court did <u>not</u> endorse "but for" causation.

SPT notes that, as in *Santa Fe*, the Arbitrator in this case concluded that there were two principal purposes to the Cerberus Transaction: (1) to obtain necessary capital for RG Steel (a "legitimate" purpose that would not trigger § 4212(c)); and (2) to evade or avoid withdrawal liability for RG Steel by removing Renco from the controlled group (an "illegitimate" purpose that would trigger § 4212(c)). The evidence supporting the second principal purpose included: the Arbitrator's conclusion that the testimony of Renco's witnesses, to the effect that they were unaware of RG Steel's potential withdrawal liability, lacked credibility; Renco's less than candid interactions with the PBGC concerning the single employer plans; the large amount of money at stake; and the hasty, eleventh-hour conversion of the Cerberus Transaction, from warrants to membership-units, to ensure that Renco would exit the controlled group.

Renco cites the decision in *Federal Express*,[12] which distinguished *Santa Fe* because the arbitrator explicitly found that the motivating-factors (low purchase price, the large amount of liability the parent company was facing, the likelihood that a subsidiary would fail, *et cetera*) were not indicative of a principal purpose to evade or avoid withdrawal liability. *See id.* at *6. By contrast, the Arbitrator *here* explicitly found that the factors in question (which were far different from those in *Federal Express*) were indeed indicative of a principal purpose to evade or avoid withdrawal liability. This finding is entitled to the same deference as those found by the

---

[12] *Trustees of the Teamsters Pension Trust Fund of Phil. & Vicinity v. Federal Express Corp.*, 1995 WL 791371 (D. Del. Dec. 27, 1995).

arbitrator in *Federal Express*.[13]

In another relevant decision, *Sherwin-Williams Co. v. New York State Teamsters Conference Pension and Retirement Fund*, 158 F.3d 387 (6th Cir. 1998), Sherwin-Williams decided to sell Lyons, a company that was losing money − but it chose to negotiate with a buyer (JRC) with no assets, no financial backing and no corporate affiliations, despite receiving many better offers. Both Lyons and JRC ultimately filed for bankruptcy and the Teamsters Fund eventually demanded payment from Sherwin-Williams of Lyons' withdrawal liability because a principal purpose in selling Lyons' stock was to evade or avoid withdrawal liability. The arbitrator found in favor of the Fund, as did the district and circuit courts.

Several factors in *Sherwin-Williams* are relevant here. First, the circuit court gave great deference, as the law requires,[14] to the arbitrator's factual finding that Sherwin-Williams must have known that Lyons was foundering, and therefore viewed Sherwin-Williams's proffered testimony to the contrary as not-credible. *Id.* at 394. Moreover, the court acknowledged that Lyons represented a massive drain on Sherwin-Williams's cash-flow, and Sherwin-Williams wanted to rid itself of Lyons, a "legitimate" purpose that would not trigger § 4212(c). On the other hand:

---

[13] Renco also cites two cases in which the district court decided the issues directly (no arbitrator was involved), and which are factually distinguishable. *See Teamsters Joint Council No. 83 of Virginia Pension Fund v. Empire Beef Co.*, 2011 WL 201492 (E.D. Va. Jan. 20, 2011) (where the court found, by credible testimony, that the company owed far more to other creditors than the pension fund, and the timing of the transaction was not suspicious); *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 202 (S.D.N.Y. 2012). These cases are not helpful to Renco's positions.

[14] *See, e.g., Concrete Pipe & Prod. of Calif., Inc. v. Construction Laborers Pension Trust for S. Calif.*, 508 U.S. 602, 622 (1993); *Crown Cork & Seal Co. v. Central States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992); *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995).

As the arbitrator correctly pointed out, the language of the MPPAA makes it clear that an employer can have more than one principal purpose in conducting a transaction. **This is especially true where, as here, one principal purpose can be said to motivate the decision about whether to sell the company at all, while another principal purpose can be said to motivate the decision about how to sell the company.**

*Id.* (emphasis added).

Not surprisingly, Renco attempts to distinguish *Sherwin-Williams*, arguing that "the structure of the transaction was relevant evidence, not the end of the analysis." (ECF No. 25 at 32.) But the Arbitrator, here, did not rely solely on the structure of the Cerberus Transaction to conclude that a principal purpose was to evade or avoid withdrawal liability. Rather, he cited the change in structure, along with Renco's interactions with the PBGC, the amount of money at stake and the less than credible testimony of Renco's various witnesses.

The determination of whether a principal purpose of a transaction was to evade or avoid withdrawal liability, properly supported, is entitled to great deference. *Sherwin-Williams*, 158 F.3d at 394-95; *Federal Express*, 1995 WL 791371, at *5; *see also Penske Logistics LLC v. Freight Drivers & Helpers Local Union No. 557 Pension Fund*, 721 F. App'x 240, 248 (4th Cir. 2018) (Diaz, J., dissenting in part); *Chicago Truck Drivers v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir. 1989). In this case, deference to the factual findings of the Arbitrator is appropriate, because his conclusions were legally-supported and based on ample evidence in the record. The Arbitrator determined, based on the aforementioned evidence, that Renco "must have known" of the substantial size of potential withdrawal liability associated with the Cerberus Transaction. Moreover, as there can be more than one principal purpose to a transaction, the Arbitrator's conclusion that Renco's *original decision* to engage in the Cerberus Transaction was not with the intent to evade or avoid does not end the inquiry. Indeed,

the Arbitrator specifically concluded, based upon his findings of fact, that the structure, or form, of the Cerberus Transaction also was a principal purpose specifically designed to evade or avoid liability, and thus was "illegitimate" for the purposes of § 4212(c).

Alternatively, Renco contends that the Arbitrator erred by improperly asking whether the change from permanent warrants to membership units had a principal purpose to evade or avoid. Specifically, Renco quotes the Arbitrator's inquiry as to whether § 4212(c) would apply "if a finding were made that the principal purposes of the Cerberus Transaction as a whole did not include the evasion or avoidance of withdrawal liability, but a principal purpose of the conveyance of membership units did have as a principal purpose the evasion or avoidance of withdrawal liability," (ECF No. 51 at 1) (quoting Op. & Award at 15).

Renco's argument is disingenuous, because the quoted-passage was merely the Arbitrator's recitation of the parties' positions, not his conclusions on the issue. The Arbitrator, in fact, concluded that "the provisions of Section 4212(c) examine both the decision to enter into a particular transaction and also decisions as to the form or structure of the transaction" (Op. & Award at 23). A review of the record and the Opinion confirms that the Arbitrator examined the "principal purpose that motivated the decision" to engage in the Cerberus Transaction, and then examined the "principal purpose that motivated the decision" about how to do so. *Sherwin-Williams*, 158 F.3d at 395. Together, they made up the principal purposes of the Cerberus Transaction as a whole. Unlike *SUPERVALU,* the structure or form of the transaction in this case was an issue, and relevant case law makes clear that decisions relating to the form or structure of a transaction are relevant to determining the transaction's principal purpose(s). *See Sherwin-Williams*, 158 F.3d at 395; *Santa Fe*, 22 F.3d at 729; *CIC-TOC*, 911 F. Supp. 2d at 1096.

The Arbitrator found two principal purposes to the Cerberus Transaction, one of which (obtaining needed capital for RG Steel) did not invoke § 4212(c), but the other one did (ensuring that Renco existed the RG Steel controlled group). As in *Santa Fe* and *Sherwin-Williams*, the Arbitrator properly looked at the structure (or restructure) of the transaction as evidence of Renco's intent. In addition, the Arbitrator considered the evidence presented, including the testimony of Renco's witnesses, and considered the amount of money at stake. He also reviewed Renco's interactions with representatives from the PBGC, concluding that Renco misled and deceived the agency in multiple ways until after the Cerberus Transaction closed, thereby effectively precluding the PBGC from taking preventive measures.[15] While Renco argues that what occurred with the PBGC concerning the single employer plans is irrelevant, the Arbitrator concluded otherwise; and Renco has not explained why the Arbitrator erred by taking notice of this evidence as relevant to intent. Thus, Renco's argument that the Arbitrator failed to assess whether a principal purpose of the Cerberus Transaction as a whole was to evade or avoid withdrawal liability is unsupported.

In sum, the Arbitrator used the correct legal standards and relied upon ample record-facts in reaching his conclusion that a principal purpose of the Cerberus Transaction was to evade or avoid withdrawal liability.

---

[15] The Arbitrator found that Renco's deception took various forms, including: claiming that no deal was "imminent" and that "equity was off the table"; informing the PBGC that it would keep the agency apprised of any developments, and then failing to do so; telling the PBGC that it would consider a standstill agreement "when it apparently had no intention of agreeing to such a restriction after it had completed the Cerberus Transaction that resulted in its exit from the RG Steel controlled group"; and then immediately disclaiming any further responsibility for withdrawal liability for the single employer plans because it had withdrawn from RG Steel's controlled group.

### 2.  <u>Was the Change from Permanent Warrants to Membership Units Material?</u>

Renco next argues that the change from permanent warrants to membership units before the Cerberus Transaction was finalized did not materially change the economics of the deal. It further contends that it did not have an improper purpose because its only goal was to "avoid ambiguity" and "preclude litigation."[16]

SPT correctly notes that Renco's definition of a structural change — as "one that materially impacts the economics of the deal" (ECF No. 25 at 37) — is nowhere to be found in the ERISA statute or the relevant case law.  Regardless, as SPT points out, the Arbitrator did find an economic impact to Renco with respect to the change in the structure when he observed that the "amount of money . . . avoided [would be] large, even when compared to the amount of the transaction."  (Op. & Award at 72.)  As the Arbitrator phrased it:

> [E]xiting the RG Steel controlled group meant that if Renco lost the additional investment that it was making in RG Steel as a result of the Cerberus Transaction, then those losses would be offset to a large degree by the avoidance of withdrawal liability and other pension obligations that would have been Renco's responsibility if it had not left the RG Steel controlled group.

(*Id.*)

Renco's further suggestion that "avoiding ambiguity" and "precluding litigation" had nothing to do with its goal to avoid withdrawal liability is questionable at best,

---

[16]  Renco also argues (ECF No. 25 at 17, 27-28; ECF No. 44 at 17, 38, 44) that the Arbitrator found the membership-units versus warrants distinction had no impact on Renco's willingness to go forward with the transaction.  However, its citation is actually to the Arbitrator's statement that *Ari Rennert* so testified (Op. & Award at 54), and he chose not to credit this witness. Moreover, because Renco convinced Cerberus to switch from warrants to membership units, the  argument is beside the point.

and appropriately, it was not given credence by the Arbitrator.[17]  In support of its position,

Renco quotes the Arbitrator's statement that, "the only reason that Renco proposed direct equity

instead of the permanent warrants was to ensure that there could be no doubt that it successfully

left the RG Steel controlled group" (Op. & Award at 71).  Renco's conclusion would only make

sense, however, if the Arbitrator credited Renco's underlying proposition that the warrants would

have removed Renco from the controlled group; and that, while both Renco and Cerberus

believed this to be true, the PBGC could have made "some crazy argument" that the warrants did

not accomplish this purpose.  Therefore, Renco claims, the change to membership units was a

mere "relabeling" intended to clarify the situation.

Renco's argument is unpersuasive.  In fact, the Arbitrator's statement is more logically

read to convey that he found Renco's real reason for the change was to make certain that it was

removed from the controlled group, so that it could evade or avoid any potential withdrawal

liability that might arise.  Indeed, the very next sentence of the Opinion and Award states:

"The effect of the change to direct equity was to ensure that if RG Steel did not recover, as hoped

for, and ceased operations, thereby triggering withdrawal liability to the Fund in the amount of

$75 million or so, Renco would not be responsible for that liability."  (*Id.*) (emphasis added).

More importantly, the Arbitrator's Opinion determined − explicitly and by implication –

that the warrants would not have removed Renco from the RG Steel controlled group, or at least

would not conclusively have done so.  To the extent that Renco claimed that it believed

otherwise, the Arbitrator found the assertion to be unfounded and/or disingenuous based upon

the evidence presented.  As determined by the Arbitrator, Renco was not solely motivated to

---

[17]  Renco attributes to the Arbitrator a determination that "curing ambiguity was the only reason why Renco requested the change to Membership Units" (ECF No. 25 at 42, 43).  The Arbitrator made no such finding.

complete the Cerberus Transaction before the PBGC terminated the single employer plans merely so that RG Steel could receive a much-needed capital infusion. Its efforts to conceal the nature and status of the transaction from the PBGC belies any such notion.[18] In short, the Arbitrator perceived and determined that the change in transaction-structure went far beyond mere relabeling.

Although Renco's interactions with the PBGC concerned single employer plans and not the multiemployer plan, the Arbitrator found this evidence relevant because Renco's exposure to withdrawal liability was much greater for the multiemployer plan ($75 million) than for the single employer plans ($25 million). It is true that Renco witnesses testified that its concerns were not about withdrawal liability, but were solely about avoiding ambiguity and precluding litigation with the PBGC. But the Arbitrator did not find such testimony to be credible. He concluded that Renco misled the PBGC regarding the Cerberus Transaction, and then immediately disclaimed withdrawal liability as a result of it − thereby demonstrating a principal purpose of evading or avoiding withdrawal liability. These findings are well-supported, and entitled to deference.

Renco cites cases holding that mere "awareness" of withdrawal liability is not sufficient to invoke § 4212(c),[19] but the Arbitrator found far more than Renco's "mere awareness" of potential liability. Renco, moreover, cites no legal authority for the proposition that a stated-desire to "avoid ambiguity" is sufficient to evade § 4212(c).

---

[18]  Naturally, the Arbitrator did not make a finding as to what the PBGC would have done had the transaction been completed with warrants instead of membership-units. Given the Arbitrator's conclusion that the PBGC felt significantly-misled, there is little reason to believe its reaction would have been more favorable.

[19]  *Empire Beef*, 2011 WL 201492, at *3, 5; *Lopresti*, 868 F. Supp. 2d at 202; *CIC-TOC*, 911 F. Supp. 2d at 1096; *Federal Express*, 1995 WL 791371, at *6.

In short, the Arbitrator found that the change from warrants to membership units was material, and his conclusion was well-supported in both the record and the law.

### 3.  Would Warrants Have Yielded the Same Result?

Renco's next argument for vacating the Award is its contention that the Arbitrator erred by concluding that, if the Cerberus Transaction had gone forward with permanent warrants rather than membership units, Renco would have remained in the controlled group.  Renco insists that the restructuring made no difference, as it still would have exited the controlled group; and, therefore, the change in structure cannot evince Renco's intention to evade or avoid withdrawal liability.

As an initial matter, this argument is difficult to reconcile with Renco's contradictory contention that "Section 1392(c) is concerned only with subjective purpose, not the objective legal effect of the transaction's terms.  Right or wrong, Renco subjectively believed that the proposed Permanent Warrant would have caused Renco to exit the controlled group." (ECF No. 25 at 42.)

The Arbitrator did not, however, find that Renco or its attorneys subjectively believed that the warrants would have caused Renco to exit the controlled group.  While Renco presented testimony to this effect, the (lack of) credibility of these witnesses was within the sole province of the Arbitrator.  He found the witnesses not-credible, on this and other issues, and the Court will not revisit that assessment.

For example, the Arbitrator found that Mr. Ryan repeatedly sought to persuade Cerberus to switch to membership units (Op. & Award at 50); that Mr. Ryan's opinion that the warrants would have broken the controlled group was an "unpersuasive and somewhat dubious claim"; that Renco's stated-reasons for persuading Cerberus regarding the use of membership units was

34

to prevent the PBGC from asserting "some crazy argument" that the warrants were insufficient to remove Renco from the controlled group (*id.* at 51); and that the warrants *were* substantively different from membership units (*id.* at 60-62). These findings are flatly inconsistent with Renco's claimed-belief that the use of warrants would have had the same effect.

The Arbitrator further stated:

> Mr. Ryan admitted that the sole purpose for the request was a desire to have Renco cleanly exit the RG Steel controlled group − action that, as noted, would result in Renco potentially avoiding a very large projected amount of withdrawal liability to the Fund as well as a significant amount of liability with respect to RG Steel's single employer pension plans.

(*Id.* at 73.) Therefore, the Arbitrator found that Mr. Ryan's testimony supported his conclusion that the form of the Cerberus Transaction (as prompted by Renco) had a principal purpose of evading or avoiding withdrawal liability.[20]

Additionally, as discussed in Section 4, *infra,* the Cerberus Transaction did not involve warrants; rather, membership units were used, at Renco's urging. The Arbitrator concluded that this was done to avoid withdrawal liability, and the law does not sanction rewriting the transaction or considering hypothetical scenarios that did not occur. The critical issue was whether there was a principal purpose to evade or avoid liability, and the Arbitrator relied upon the evidence and arguments presented to him to conclude that there was. As a practical matter,

---

[20] Inexplicably, Renco claims that the Arbitrator found in its favor on the issue of subjective intent. This contention is based on a rather-strained reading of the Arbitrator's statement that Renco's purpose was to "ensure that there could be no doubt that it successfully left the RG Steel controlled group." (Op. & Award at 71.) Renco's myopic interpretation is in direct conflict with the Arbitrator's ultimate conclusions as to Renco's liability. Indeed, as SPT points out, Renco specifically requested and insisted upon the change from warrants to membership units. While Renco argues that this change did not drive the transaction as a whole, it is hard to ignore Renco's efforts to ensure that this change was made, which substantially undermines Renco's claim about its subjective belief.

then, the questions posed by Renco's line of reasoning are both hypothetical and irrelevant.

In any event, the Arbitrator considered Renco's arguments – vis-à-vis the hypothetical use of warrants causing an exit from the controlled group − and rejected them. As noted in his Opinion, Renco argued that the permanent warrants would have been sufficient under the Internal Revenue Code to effect a change in Renco's status even if they were not exercised. (Op. & Award at 55.) Renco asserted that the warrants would have given Cerberus all material rights of ownership whether exercised or not, thus giving Cerberus the economic equivalent of full ownership. (*Id.* at 57.) Therefore, according to Renco, the "relabeling" was not a change in structure. (*Id.*) SPT, on the other hand, urged that this was a material difference, and the Internal Revenue Code would require more before a change in Renco's membership-status might result. (*Id.*)

Under the relevant Treasury regulation, a limited liability company (LLC) such as RG Steel Holdings LLC[21] is treated as a partnership, 26 C.F.R. § 301.7701-3(b)(1)(i), and the relevant issue for purposes of ERISA is whether it owns "at least 80 percent of the profits[-]interest or capital[-]interest of such partnership." 26 C.F.R. § 1.414(c)-2(b)(2)(i)(C). Thus, to exit RG Steel's controlled group, Renco would have had to divest itself of more than 20% interest in both the capital and profits of Holdings. (Op. & Award at 58.) The Arbitrator noted:

> Renco acknowledges that ordinary warrants are insufficient to change Renco's ownership of RG Steel. Renco argues, instead, that the Cerberus-prepared warrants contained in the draft Warrant and Equityholder Agreement that were prepared prior to January 14, 2012 are different; that they are the economic equivalent of a transfer of membership interests; and that the IRS would treat them as equivalent to an immediate transfer of capital and profits interests even

---

[21]  As noted above, Renco owned 100% of RG Steel Holdings, LLC, which in turned owned 100% of RG Steel. Thus, transfer of more than 20% of the ownership of Holdings would reduce Renco's indirect ownership in RG Steel to less than 80%.

prior to any execution for purposes of controlled group status.

(Op. & Award at 56.)

Section 4 of the draft Warrant and Equityholder Agreement drafted by Cerberus provided

that:

> 4. <u>WARRANT HOLDER NOT DEEMED A Member</u>.  Except as otherwise
> specifically provided herein and in the Equityholders' Agreement, the Holder,
> solely in such Person's capacity as a holder of this Warrant, shall not be entitled
> to vote or receive dividends or be deemed a Member of the Company for any
> purpose, nor shall anything contained in this Warrant be construed to confer upon
> the Holder, solely in such Person's capacity as the Holder of this Warrant, any of
> the rights of a Member of the Company or any right to vote, give or withhold
> consent to any action (whether any reorganization, issue of stock, reclassification
> of stock, consolidation, merger, conveyance or otherwise), receive notice of
> meetings, receive dividends or subscription rights, or otherwise, prior to the
> issuance to the Holder of the Membership Units which such Person is then
> entitled to receive upon the due exercise of this Warrant.

(*Id.* at 58.)

SPT points to this language as support for Cerberus's intent during the negotiations that it

would not be a member of RG Steel, and that no ownership interest would be conveyed.

Renco responds that Section 4 explicitly states "except as otherwise specifically provided

herein," and then cites to Section 2, which provided:

> 2. <u>DISTRIBUTION OF ASSETS:  PURCHASE RIGHTS</u>.  If the Company at
> any time . . . shall declare or make any dividend or other distributions of its assets
> (or rights to acquire its assets) to any or all holders of Membership Units, by way
> of return of capital or otherwise (including, without limitation, tax distributions of
> any kind, any distribution of cash, stock or other securities, property or options by
> way of a dividend, spin off, reclassification, corporate rearrangement, scheme of
> arrangement or other similar transaction) (the "Distributions") . . . then the Holder
> will be entitled to such Distributions . . . which the Holder could have received
> . . . if the Holder had held the amount of Membership Units acquirable upon
> complete exercise of this Warrant . . . .

(ECF No. 27 Ex. 51 at 9817.)  Based upon these provisions, Renco contends that immediately

upon closing:

> Cerberus would have been entitled to share in distributions of profits (*i.e.* "any distribution . . . by way of a dividend . . . or other similar transaction") and capital (*i.e.* "return of capital)." The Permanent Warrant therefore would have conveyed a 24.5% ownership interest in RG Steel immediately on closing, even if it was never exercised, and therefore would have broken the controlled group.

(ECF No. 44 at 50.)

Upon his review of this issue, the Arbitrator concluded:

> The draft Warrant . . . treats regular distributions (Section 2) differently from the sale of all or substantially all of RG Steel Holdings' assets (Section 3) which are to be provided to Cerberus only upon exercise of the Warrant (although it sanctions the grant of those distributions retroactively upon execution of the Warrant). At a minimum, the right to have received any such distributions was unclear and may well not have been permitted at all absent execution of the Warrant by Cerberus.

(*Id.*)[22] "Moreover, the draft Warrant and Equityholder Agreement would have extended to Cerberus rights that it typically seeks and obtains in the warrants it receives as a lender, but was not shown to extend to Cerberus the full community of interest in the profits and losses of RG Steel Holdings LLC prior to exercise." (*Id.* at 61.)

Clearly, the parties disagree regarding the impact of warrants as opposed to membership units as relates to exiting the controlled group. SPT argues that, while the IRS in certain situations can disregard the form of a transaction in accordance with its substance, *Coleman v. Comm'r*, 87 T.C. 178, 201-04 (1987), *aff'd mem.*, 833 F.2d 303 (3d Cir. 1987); *Estate of Durkin v. Comm'r*, 99 T.C. 561, 571-74 (1992), there is no authority for Renco (the "taxpayer" in this

---

[22] Section 3 provided that, if Cerberus exercised the warrant, it would have been permitted to participate in capital transactions of RG Steel such as mergers, reorganizations, consolidations and sales.

scenario) to do so under the circumstances, *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). The Arbitrator cited *Graney v. United States*, 258 F. Supp. 383 (S.D.W. Va. 1966), *aff'd mem.*, 377 F.2d 992 (4th Cir. 1967), in which the court held that a taxpayer who was granted an option to purchase up to 500 shares of stock during a five-year period following a merger and also granted the right to vote the stock, to exercise all stockholder's rights with respect thereto and to receive all benefits therefrom during the life of the option would not to be treated as the holder of the stock prior to exercise of the option.

SPT further argues that the grant of an option to purchase stock does not take the grantor out of the controlled group. *Northwestern Steel & Supply Co. v. Comm'r*, 60 T.C. 356, 361 (1973).

Renco contends that the permanent warrants were not options and that the Arbitrator erred by calling them "options" and failing to examine the substance rather than the form of the transaction. "A common-sense reading of the statute indicates that in incorporating the revenue code's common control provisions into the MPPAA, Congress was more concerned with the degree of control exercised over the corporation involved than with precisely classifying any particular agreement as an option." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 124 (3d Cir. 1986). However, SPT points out that the issue in the *Barker & Williamson* case was whether the actual 75% owner of stock in the employer corporation could, by virtue of an offer to his wholly-owned corporation, be deemed to own the other 25% under the ownership attribution rules in 26 U.S.C. § 1563(e)(1) and (b)(5). SPT contends that the case had nothing to do with whether options with pre-exercise rights would convey an ownership interest.

According to SPT, the fact that Cerberus might have been entitled to share in distributions from Holdings (*i.e.*, a potential upside) before exercise of the Permanent Warrant did not change the fact that the warrant did not extend to Cerberus the full community of interest in the profits and losses prior to exercise. SPT cites cases in which courts have held that taxpayers who were entitled only to a share of a partnership's profits or gains were not partners for tax purposes, and thereby had to treat the amounts paid to them as compensation (ordinary income) and not as a share of the partnership's gains (generally, capital gains).[23]

Renco responds that these cases are not on point because they involved "the right to share in limited income streams generated by specific assets." (ECF No. 44 at 54.) Renco notes that RG Steel Holdings had only one asset, the stock in RG Steel. However, as SPT notes, the concept of a partnership for federal income tax purposes does not require the entity to hold more than one asset. Renco has not explained how the distinction it draws makes a difference.

The parties extensively briefed this issue before the Arbitrator and, as he notes, certain aspects of this issue were the subject of expert and lay witness reports and testimony. (Op. & Award at 55). Having reviewed the evidence and the law, the Arbitrator ultimately concluded:

> [A]fter review of the draft agreements, the final terms of the Cerberus Transaction, and the cited case law and regulations, I find that there were material differences between the draft Warrant and Equityholders Agreement and the final Cerberus Transaction documents relative to the relative effects of those two

---

[23] *See, e.g., Pounds v. Comm'r*, 372 F.3d 342, 346 (5th Cir. 1967) (right to receive 25% of net profits from the sale of land was ordinary income, not share of seller's capital gains); *Estate of Smith v. Comm'r*, 313 F.2d 724, 732-33 (8th Cir. 1963) (right to fixed percentage of partnership's trading gains was compensatory and not distributive share of partnership income); *Kessler v. Comm'r*, 44 T.C. Memo (CCH) 624 (1962) (right to 15% of gross receipts from land sale venture in excess of 15% of related gross expenditures was compensatory ordinary income and not share of seller's capital gains). *See also Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 201 (1942) ("Whatever rights a warrant holder may have . . . he is not a shareholder. His rights are wholly contractual.").

arrangements upon the continued status of Renco as a member of the RG Steel controlled group. The Cerberus Transaction, as executed, clearly removed Renco from the controlled group. Following review of the record evidence and applicable law, I am unable to similarly find that the draft Warrant and Equityholders Agreement provisions would have resulted in Renco's exit from the RG Steel controlled group.

(Op. & Award at 62.) He further determined that Renco's contention − that using warrants would have removed Renco from the controlled group – was "an unpersuasive and somewhat dubious claim." (*Id.* at 74.) But regardless of what might have happened hypothetically, Renco's actions − including the last-minute restructuring of the Cerberus Transaction to convey membership units − revealed a principal purpose to evade or avoid withdrawal liability.

The Arbitrator's Opinion regarding the above issues are detailed and thorough. The Arbitrator was unconvinced, as a matter of law, that, had the transaction been completed with permanent warrants, Renco would have exited the controlled group. Renco has not persuaded the Court that the Arbitrator committed an error of law. As the Arbitrator found, although the draft warrants would have conveyed some interests to Cerberus upon completion of the transaction, they would not have conveyed sufficient interests to support treating Cerberus as a partner with an ownership interest until they were exercised.

Most importantly, even assuming Renco was correct about what would have occurred had draft warrants been utilized, this does nothing to undermine the Arbitrator's well-founded, ultimate conclusion that the Cerberus Transaction had a principal purpose of evading or avoiding withdrawal liability.

### 4. **Did the Arbitrator Properly Disregard the Entire Cerberus Transaction?**

Renco's final argument is that the Arbitrator erred by disregarding the entire Cerberus Transaction. Renco suggests that, instead, he should have disregarded only the "aspect" of the

41

transaction involving the use of membership units and reformulated the transaction with permanent warrants.  Renco contends that this would have resulted in its exit from the controlled group without withdrawal liability.  SPT, on the other hand, asserts that the Arbitrator correctly concluded that § 1392(c) does not permit a court/arbitrator to rewrite the transaction.

The Arbitrator consistently concluded that a principal purpose of the Cerberus Transaction as a whole was to evade or avoid withdrawal liability (based in part on the restructuring to convey membership units rather than permanent warrants); and he therefore disregarded the Cerberus Transaction as a whole.  As the Arbitrator correctly determined, the Cerberus Transaction, once discarded, cannot be "replaced by the proposed and ultimately rejected provisions for permanent warrants for purposes of determining whether or not Renco remained in the controlled group."  (Op. and Award at 73).  *See Sun Capital,* 724 F.3d at 149 (§ 1392(c) does not "instruct or permit a court to take the affirmative step of writing in new terms to a transaction or to create a transaction that never existed"); *see also Einhorn v. Apex Equip. Co.*, 2014 WL 4209547, at *8 (E.D. Pa. Aug. 26, 2014).

Renco argues that *Einhorn* is not on point because it merely holds that a court should "treat the offending transaction as if it did not occur," without defining the term "offending transaction."  It further argues that *Sun Capital* concerned a company that took steps to avoid acquiring a controlling stake in a contributing employer, not a case in which liability is based on an employer's sale of a portion of a subsidiary such that it is no longer in the controlled group.  Nevertheless, the principle cited in *Sun Capital* remains constant:  courts cannot rewrite a transaction after concluding that it had a principal purpose of evading or avoiding withdrawal liability.  Simply put, if the Cerberus Transaction had not occurred, Renco would have remained the 100% owner of RG Steel at the time it incurred withdrawal liability, and Renco would be

liable as part of RG Steel's controlled group.

## CONCLUSION

In his Opinion and Award, the Arbitrator found that:

- Renco failed to disprove the Fund's determination that a principal purpose of the Cerberus Transaction was to evade or avoid withdrawal liability for the Fund; and

- Even if the matter was presented to him without any presumption of correctness, a preponderance of the evidence affirmatively established that a principal purpose of the Cerberus Transaction was to evade or avoid liability.

The Arbitrator's factual findings have not been rebutted by a clear preponderance of the evidence, and, thus, are entitled to great deference. Further, the Court has reviewed the Arbitrator's legal conclusions, *de novo*, and finds no error(s) of law warranting a vacation of the Final Award. Accordingly, the Court hereby enters the following:

## II. ORDER

Plaintiffs' Motion for Partial Summary Judgment (**ECF No. 24**) is **DENIED**; Defendant's Motion for Summary Judgment (**ECF No. 34**) is **GRANTED**; and the Arbitrator's Opinion and Award is **CONFIRMED**. A Rule 58 order will be entered contemporaneously herewith, and the case will be marked closed.

IT IS SO ORDERED.

September 30, 2019

s/Cathy Bissoon
Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All Counsel of Record